HOLDER v. WESTERN GERMAN BANK.

(Circuit Court, S. D. Ohio, W. D. March 10, 1904.)

1. BANKS AS COLLECTION AGENTS—FORWARDING DRAFT FOR COLLECTION—USAGE.

One depositing in a bank for collection at his risk a draft on a person in a distant city is presumed to know that, in accordance with general usage, the draft will be forwarded to another bank at the place of the drawee's residence for collection, and that the proceeds will be remitted in bank exchange, and to have contracted with reference to such usage.

2. SAME—LIABILITY FOR PROCEEDS—DIRECTION AS TO MANNER OF REMITTANCE.

A bank forwarding a draft for a customer for collection by another bank did not, by giving directions that the proceeds be remitted in New York exchange, change the relation between the two banks from that of principal and agent to one of creditor and debtor, with respect to the money collected, so as to render it liable to the owner of the draft for the proceeds on the failure of the receiving bank after making the collection, but before remittance, on the theory that it had by such direction deprived him of the right to recover the proceeds from the receiver of the insolvent bank, as a trust fund.

Albert Bettinger, for plaintiff.
H. D. Peck, for defendant.

THOMPSON, District Judge. I am prepared to dispose of the case now. It is conceded that the draft in question was received for collection under a special contract between the parties, which was, in substance, that it would be credited to the account of Holder upon the books of the defendant bank, and then forwarded for collection at Holder's risk. If collected, the account would stand as it was made by crediting the draft, but, if it could not be collected, then the credit would be withdrawn, by charging the amount thereof against holder. The bank agreed to use due diligence in the selection of an agent for the collection of the draft. The bank says that it did use due diligence in selecting an agent when it selected the First National Bank of Jacksonville, Fla.; that it sent the draft to that bank for collection; that it was collected, but never remitted, by reason of the failure of the bank. The plaintiff, however, claims that it was collected, and in effect placed to the credit of the defendant, and that the moneys thereby became incorporated into the general funds of the Florida bank, and that the defendant now stands as one of the general creditors of the Florida bank for the amount thereof; that it has no lien upon this particular deposit, and does not occupy the position of a preferred creditor; that

¶ 1. Presumptions as to customs and usages, see note to Great Western Elevator Co. v. White, 56 C. C. A. 394.

the Florida bank does not hold it in trust, but that it has become part of the moneys of the bank for distribution among creditors.

Now, it is conceded in the argument that originally the relation between the defendant and the Florida bank was one of principal and agent—a trust relation—and that under that relation the plaintiff and the defendant might have followed up the money in the hands of the receiver, and have required the receiver to surrender it as trust money, not belonging to the Florida bank, not belonging to its general creditors, not available for the payment of its debts, but money that should be separated from the other moneys in the Florida bank, and held by it in trust for these parties, the defendant bank and its depositor; but the plaintiff insists that the trust relation was put an end to by defendant, in violation of its duty to the plaintiff under the special contract between them, so that the moneys collected upon the draft were confused with the moneys of the Florida bank, and entered into and became a part of the assets of the Florida bank, and subject to the claims of its general creditors, and that defendant, because of its violation of the contract, has become liable to account to the plaintiff for the full amount of said moneys, and must look to the receiver for its distributive share of the assets of the Florida bank.

The turning point of the case is whether the evidence here shows that the trust relation was terminated by the defendant, and whether the moneys passed into the hands of the Florida bank, and became a part of its general funds, ceasing to be moneys held in trust, because of the direction contained in the letter transmitting the draft for collection: "Remit in New York exchange." What is the exact language?

Mr. Bettinger: "Please remit New York exchange."

The Court: "Please remit New York exchange." There is nothing in the case which, upon grounds of public policy, would require the court to say that the trust relation was terminated, and that the defendant must account to plaintiff for the moneys. There is nothing of that kind in the case. So that it becomes a question, under all the evidence in the case, as to what was the intention of the parties; that is, the defendant here and the bank in Florida? When the direction was given to remit in New York exchange, and when the bank there, in compliance with that request or direction, did so, does the evidence here require the court to hold that they intended to, and did, put an end to the trust relation existing between them, and substituted for it the relation of debtor and creditor?

Now there are well-known, generally known, commercial usages, of which everybody has, and must have, knowledge, and of which judicial notice is taken by the courts; and the court might, in this case, if there were no evidence bearing on the point, take judicial notice and knowledge of the usage of bankers, that, where a check or draft is delivered to a bank for the purpose of collection, it will be forwarded to some other bank near the place where the debtor or the drawee of the draft resides, there to be collected and remitted by exchange, and, as the testimony shows (and it is almost a matter of common knowledge, of which the court would take judicial notice), that 8 times out of 10 the exchange used would be New York exchange. As counsel for the plaintiff puts it, there are only 25 chances out of 100 that New York ex-

change will not be used. In this case the defendant expressed a preference for New York exchange, which excluded the risk of being compelled to receive exchange upon some other city; that is, it eliminated the 25 chances, and made it perfectly certain that the bank here would receive New York exchange. It is urged that the expression of that preference operated to put an end to the relation of principal and agent, and to create that of debtor and creditor, working a confusion of these moneys with the moneys of the Florida bank, so as to put an end to their trust character.

Now, it is difficult to understand how it can be claimed that the defendant here intended to deposit these moneys with the Florida bank, simply because it made the request for New York exchange, especially in view of the well-established usage that the plaintiff here was bound to know, and did know, that exchange of some kind would be sent. It is difficult to understand how it can be claimed that the expression of the preference for New York exchange meant, and was understood by both parties to mean, that the relation between them of principal and agent should cease, and that of debtor and creditor take its place. By the expression of the preference, did the defendant say to the Florida bank: "Our relation now is that of debtor and creditor. You owe me $4,000. I am your creditor for $4,000 from this moment, because I have expressed a preference for New York exchange, or have required you to remit in New York exchange." It is conceded that, if the bank had made no request for New York exchange, the relation of principal and agent would have continued, yet it is urged that it was terminated simply because the principal said to the agent: "I direct you, when you collect this, to remit New York exchange, and not any other exchange, we both understanding and acting upon the knowledge that the usual course of business will require you, as a matter of convenience and safety, to remit it in exchange of some kind; and while you might, in accordance with usage, remit exchange on New Orleans, Chicago, St. Louis, Philadelphia, or New York, yet we both understand that New York exchange is usually used, because it is good everywhere, and I therefore direct you, as my agent, to send that exchange, and no other."

Now, if there had been an arrangement between them, such as is stated in one of the cases cited, where the collecting bank was permitted to hold and use the money until the 20th of the month, and then remit in New York exchange, then the court would be required to hold that the relation of debtor and creditor existed between them. But here there was the peremptory direction: "Collect this draft or check, and remit the amount in New York exchange." The Florida bank had no authority under that direction to mingle these moneys with its moneys, and to treat them as its moneys for general purposes. All it was authorized to do with these moneys was to buy New York exchange and forward it. Counsel admit that if this direction had not been given, and the Florida bank, following the usage in such cases, had procured New York exchange, just as it did do, that would have maintained the trust relation—would have continued it—and the plaintiff would have been entitled to recover the full amount of these moneys from the receiver of the Florida bank. Without the request or di-

rection—whichever you please to call it—the Florida bank was free to and might have forwarded exchange upon some of the larger cities of the country, other than New York, and, possibly upon some of the smaller cities or towns of the south, and that knowledge may have induced the direction or request that it be sent in New York exchange.

I listened attentively to the ingenious and able argument of counsel for the plaintiff. I tried to follow him closely, but I am wholly unable to see how this case can come within the rule laid down in any of the cases which counsel cited, where the circumstances or the language used show that the money collected was to be placed to the credit of the bank transmitting the draft or paper for collection. Take the case of the Fidelity Bank. It was to remit, I believe, on the 10th and the 21st, and in the meantime the money was to stand to the credit of the transmitting bank. There the arrangement contemplated that the bank, upon collection, should have the use and benefit of those moneys during the time between the remitting days. It was to be money that would stand to the credit of the transmitting bank, and the collecting bank was to enjoy the use of it. The fact that the collecting bank held it for 10 or 20 days was of sufficient value to make that bank gladly undertake the collection upon those terms, but there is nothing of that kind here. Plaintiff was bound to know that in the regular course of business the check would be sent to a bank in Florida for collection, and that, when collected, the amount of it would be transmitted here in commercial paper of some kind, and whether it was one kind or another made no difference. The transmitting bank here, within the terms of the contract with the plaintiff, might, as it did, express a preference for one kind of exchange over another kind. It would be no departure from the regular usage. It would be no extraordinary or out of the way means employed to bring the money here which would be unsafe or expose it to risk. Plaintiff had a right to expect that the ordinary usage would be followed, and that meant that it would come here in the form of exchange, and it was no violation of the contract to express a preference for the best exchange known in business circles—admittedly, New York exchange.

The finding will be for the defendant.